Larry D. LOMAZ;  Pacific Financial
Services of America, Inc.,
Plaintiffs–Appellants,

v.

William A. HENNOSY, et al.,
Defendants–Appellees.

No. 96–4165.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 21, 1997.

Decided July 29, 1998.

Daniel T. Kobil (argued), Capital University Law School, Columbus, OH, Mark H. Ludwig (briefed), Cole Company, Akron, OH, for Plaintiffs–Appellants.

Aretta K. Bernard (argued and briefed), Roetzel & Andress, Akron, OH, for Defendants–Appellees.

Before: SILER, BATCHELDER, and GIBSON,[*] Circuit Judges.

BATCHELDER, Circuit Judge.

Plaintiff, Larry Lomaz, brought this action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights committed by a couple of prosecuting attorneys for Portage County, Ohio, in what Lomaz describes as a scheme to drive him out of the fireworks business. At the time he brought the suit, Lomaz owned and operated Midwest Fireworks Manufacturing Company, Inc., and Fireworks Unlimited, Inc., both of which were businesses engaged in the manufacture and sale of fireworks. He also owned Plaintiff Pacific Financial Services, Inc., the company that owns the real property on which Midwest Fireworks and Fireworks Unlimited are located.[1] Defendants John J. Plough and Louis R. Myers were the Prosecutor and Assistant Prosecutor for Portage County, Ohio, and undertook the prosecution of Lomaz for various violations of Ohio fireworks laws.[2] The district court granted summary judgment to both defendants on immunity grounds, and Lomaz timely appealed. For the reasons that follow, we AFFIRM the judgment of the district court.

## I.

This convoluted story begins, at least insofar as is relevant to this lawsuit, in November 1985, when Myers incorporated a business called "Buckeye Fireworks and Novelty Company, Inc." Lomaz claims that he had previously owned a company incorporated under the same name, and that Myers incorporated the new business "clandestinely" in an attempt to sabotage Lomaz's fireworks operations. Myers says that he incorporated the company as part of an ongoing investigation of Lomaz.

On May 28, 1987, State Fire Marshall William Hennosy sent Lomaz a letter denying him a variance to sell fireworks not manufac-

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Although both Lomaz and Pacific Financial Services, Inc. are the plaintiffs in this case, we

will often refer to Lomaz as the plaintiff for purposes of clarity.

2. The numerous other defendants in this action have been dismissed and there are no longer any appeals pending as to them.

tured by his companies. The letter stated that the variance was being denied because the Fire Marshal's Office had received notice of an outstanding court order issued June 18, 1986, by Judge Evan Reed, permitting Lomaz to sell only those fireworks manufactured by his companies until such time as he obtained a wholesaler's license. Myers had forwarded a copy of the order in a letter sent to Hennosy on May 15, 1987. Hennosy stated specifically that he would have issued the variance had he not received the letter from Myers. As it turned out, that order was no longer valid, but the damage had been done.

Hennosy and Billy Phillips, then Chief of the Ohio State Fire Marshal's Inspection Bureau, made a visit to the Midwest Fireworks facility in late June 1987. During that visit, they noticed a variety of violations of the fireworks laws of Ohio. A few days later, television, radio, and newspaper stories came out reporting on the very same types of violations occurring frequently in the Ohio fireworks industry. Then, on June 30, 1987, Myers informed Phillips that the prosecutor's office had sent an undercover agent to the Midwest Fireworks facility and that the agent had discovered the same types of violations. On the evening of June 30, Phillips, Hennosy and several others made another trip to the Midwest Fireworks facility. This time, they sent in several people undercover, including a couple of minors, who illegally procured about $100.00 worth of Class B and Class C fireworks [3] in violation of Ohio law.

The fire marshals met with Plough and Myers on July 1, 1987, and expressed their belief that they had enough evidence from the previous day's trip to Midwest Fireworks to prosecute Lomaz. Together, the fire marshals and the prosecutors decided that they would get a search warrant and conduct an all-out raid of the Midwest facility. The prosecutors prepared an affidavit for Phillips to sign and drafted a search warrant that they took to Judge DiPaulo, of the Portage County Municipal Court. Judge DiPaulo signed the warrant after some questioning of the prosecutors.

On July 2, the fire marshals began executing the warrant. Neither Plough nor Myers was present on the premises at any time during the raid. After the first day, however, the marshals temporarily stopped the raid to call Myers for legal advice about how to proceed. Specifically, Kenneth Cox, then Director of the Ohio Department of Commerce,[4] testified:

> As the enforcement action proceeded, I began to have concerns about its scope. For example, I did not expect fireworks to be taken from other than the sales building, and I did not understand why a safe was confiscated.... I felt I needed legal advice and ... I called John Plough, the Portage County Prosecutor.

Cox's concerns notwithstanding, the warrant clearly specified that all of the buildings at the facility were to be searched; the warrant also listed the safe as an item to be seized. Plough told Cox to keep the seizure going, because it was necessary to seize all of the items listed in the search warrant and they would not be able to stop the seizure and then start it up again later.

Cox and his men continued to seize items from the Midwest facility throughout the July 4th weekend. During the course of the raid, the marshals seized mass quantities of fireworks, over $140,000 in operating capital, cash registers, over seventy "banker's boxes" of business records and a large safe. The seized fireworks were taken to the State Fire Marshal's Office and then to Rickenbacher Air Force base. Apparently, the Fire Marshal's Office never had possession of the safe or registers taken from the Midwest facility.

Lomaz was indicted by a grand jury. His motions to dismiss the indictment and to suppress the evidence obtained during the

---

3. Class B fireworks are those fireworks commonly associated with large public displays (e.g., municipal July 4th displays, baseball games, etc.). To purchase Class B fireworks, a person must present a special display license. Class C fireworks are less dangerous, but minors may not purchase them. A purchaser must present valid ID proving that he is at least 18 years of age.

4. The Division of the State Fire Marshal is a part of the Ohio Department of Commerce. Thus, Cox had authority at that time to enforce Ohio's fireworks laws.

raid were denied.[5] The case proceeded to trial, and at the close of the state's case, the trial judge dismissed nine of the ten counts against Lomaz. The remaining count was dismissed after Lomaz pled guilty to misdemeanor violations of the fireworks law.[6] Soon thereafter, Lomaz filed the instant § 1983 action.

## II.

### A. Standard of Review

This Court reviews *de novo* a district court's grant of summary judgment. *City Management Corp. v. United States Chem. Co., Inc.*, 43 F.3d 244, 250 (6th Cir.1994); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir.1993); *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Riv. P. 56(c). In deciding upon a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *City Management*, 43 F.3d at 250.

### B. The Complaint

Of the seven counts in the Plaintiff's Second Amended Complaint, only counts one, four, and five remain. In count one, Lomaz asserts that Plough and Myers:

knowingly prepared an affidavit and search warrant and obtained a search warrant that was not based upon probable cause, that was overbroad and unreasonable on its face, and that failed to particularly describe the places to be searched and the things to be seized, all in violation of the

Fourth and Fourteenth Amendments to the Constitution of the United States.

Count four charges that Plough and Myers "utilized their official titles to engage in a . . . scheme to deprive plaintiffs of their property and business," by incorporating a company called Buckeye Fireworks and Novelty Company, Inc., a name previously used by Lomaz, and by preparing, obtaining and executing a search warrant that was overbroad, unreasonable and lacking in specificity. Count four alleges that these actions were intended to and in fact did result in procedural as well as substantive due process violations, the taking of property without just compensation, and unreasonable search and seizure, in violation of the Fourth, Fifth and Fourteenth Amendments. Finally, Lomaz alleges in count five that "Plough and Myers possessed personal property of the plaintiffs unlawfully seized from plaintiffs' premises," including "plaintiffs' business records, customer lists, and other proprietary information, and attorney-client correspondence," and as a result of this unlawful possession of plaintiffs' property, "Plough and Myers have deprived plaintiffs of lawful businesses without due process of law in violation of the Fourteenth Amendment."

The defendants claim that they are entitled to absolute immunity for all of the activities that Lomaz claims violated his various constitutional rights. The district court found that absolute immunity protected all of defendants' actions except the incorporation of the business; as to that action, the court held, the defendants were entitled to qualified immunity.

### C. Absolute Immunity

Although 42 U.S.C. § 1983 does not contain any language which suggests a defense of official immunity, the Supreme

---

**5.** The motion to suppress was denied because, *inter alia*, the court found that the magistrate had probable cause to issue the warrant and it was properly served and executed.

**6.** The district court included this disposition of the ten counts in the indictment in its findings of fact. Lomaz maintains on appeal that the district court erred in finding that the final count had been dismissed after Lomaz pled guilty to

misdemeanor violations. It is clear from the record provided to us that nine of the ten counts were dismissed at the close of Lomaz's trial. The parties have provided us with nothing relative to the final disposition of the tenth count, but we conclude that even if there is a genuine issue with regard to this factual matter, it is not material to the defendants' entitlement to summary judgment.

Court long ago decided that Congress could not have intended to abrogate immunities "well grounded in history and reason." *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Accordingly, the explicit language of § 1983, which states that a person will be liable under that section if he, "under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983, is limited by two recognized exceptions: qualified immunity and absolute immunity. The former, the most common type of official immunity, subjects officials to liability for the performance of discretionary functions only when their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Butz v. Economou*, 438 U.S. 478, 508, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

■ Some officials, however, perform "special functions" that deserve absolute protection from liability because they are similar to the kinds of functions that would have been immune at common law, when Congress enacted § 1983. *Butz*, 438 U.S. at 508, 98 S.Ct. 2894. This "absolute immunity" is recognized only sparingly, and the official seeking the immunity bears the burden of showing that his actions are entitled to such absolute protection. *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).

■ Courts use a "functional approach" to determine whether absolute immunity is available to protect an official from liability for the particular activities alleged to have violated a plaintiff's rights. *Id.* Thus, we look to the "nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (quoting *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)). Furthermore, the *Buckley* Court explained, we must focus "on the conduct for

which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful." *Id.* at 271, 113 S.Ct. 2606 (citing *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

In *Imbler*, the prosecutor was sued for wrongful prosecution; the Supreme Court held that a state prosecutor is absolutely immune from liability for the initiation and pursuit of a criminal prosecution, including the presentation of the state's case at trial. *Imbler*, 424 U.S. at 431, 96 S.Ct. 984. The Court considered and rejected any exception for actions otherwise entitled to this absolute immunity but undertaken by the prosecutor maliciously or in bad faith: "To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Id.* at 427, 96 S.Ct. 984.

Although *Imbler* left the question open, the Supreme Court later decided in *Burns* that a prosecutor could receive only qualified immunity for his activities that are administrative or investigative in nature. *Burns* held that the prosecutor was entitled to absolute immunity for his participation in a probable cause hearing, because "appearing before a judge and presenting evidence in support of a motion for a search warrant clearly involve the prosecutor's role as advocate of the State, rather than his role as administrator or investigative officer." *Id.* at 491, 111 S.Ct. 1934 (internal quotations omitted). The prosecutor was entitled to only qualified immunity, however, for the act of giving legal advice to the police. *Burns*, 500 U.S. at 496, 111 S.Ct. 1934. The vital difference between activities protected by absolute immunity and those protected by qualified immunity is that the former must be "closely associated with the judicial process." *Id.* at 495, 111 S.Ct. 1934.

■ In *Buckley*, the Court reviewed its holdings in *Imbler* and *Burns*, and emphasized that, although *Burns* had made it explicit that administrative and investigative functions not related to the prosecutor's preparation for the initiation of a prosecution or for judicial proceedings are not protected by absolute immunity, "acts undertaken by a prosecutor in preparing for the initiation of

judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. The Court in that case found a prosecutor entitled to only qualified immunity for conducting investigative work in order to decide whether to arrest a suspect. *Buckley,* 509 U.S. at 275, 113 S.Ct. 2606. The *Buckley* Court noted that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274, 113 S.Ct. 2606. The challenged conduct of the prosecutors in that case was directed wholly toward finding evidence that would support the arrest of a suspect. "After *Burns,* it would be anomalous, to say the least," the Court said, " to grant prosecutors only qualified immunity when offering legal advice to the police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested." *Id.* at 275, 113 S.Ct. 2606. Where the prosecutor acts more as an administrator or investigator (*i.e.,* like a police officer), he may claim only qualified immunity: "[w]here the functions of prosecutors and detectives are the same ... the immunity that protects them is also the same." *Buckley,* 509 U.S. at 276, 113 S.Ct. 2606.

■ At issue in the appeal before us today is whether the district court erred in concluding that no genuine issue of material fact remained for trial, and that, except for the incorporation of the business under the same name formerly used by Lomaz, the defendants were entitled to absolute immunity for the actions of which Lomaz complains. To resolve this issue, we must determine wheth-

er the challenged actions were "intimately associated with the judicial phase of the criminal process," *Burns,* 500 U.S. at 493, 111 S.Ct. 1934 (quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. 984) or "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. First, however, we must sort out exactly what the challenged actions of the defendants were.

■ Lomaz would have this court apply this functional analysis to a number of discrete actions taken by Plough and Myers, including: (1) Myers' call to Phillips initiating the investigation; (2) the prosecutors' decision to send an undercover employee of the prosecutor's office to make purchases at Midwest Fireworks; (3) the prosecutors' actions in sending the June 1986 order to the state fire marshal to convince him not to issue a variance to Midwest Fireworks; (4) the preparation of the affidavit and search warrant; (5) the advice given to the fire marshals that they should continue the raid; (6) the retention of possession of plaintiffs' property that was seized by the fire marshals; and (7) Myers' incorporation of Buckeye Fireworks and Novelty Company, Inc. It is true that each of these actions is alleged in the complaint. But only the last four of these actions are material to the counts in this lawsuit on which the district court granted the summary judgment from which Lomaz now appeals.[7] We are left, therefore, with only those actions of the defendants related to preparing, obtaining and executing the search warrant, their actions relating to the evidence seized pursuant to that warrant, and their incorporating the business under a name previously used by Lomaz.

7. Lomaz's complaint contains a long list of activities that he claims Plough and Myers undertook as part of a scheme to target him and run him out of business, allegedly for their own personal gain. We are not unsympathetic to Lomaz's allegations of improper motive, as the facts do seem to indicate that these prosecutors may have been motivated by something other than the good of the community. Nevertheless, the motives of an official are irrelevant to the determination of absolute immunity from a § 1983 suit. "Absolute prosecutorial immunity is not defeated by a showing that a prosecutor acted wrongfully or even maliciously.... The decision to prose-

cute ... 'even if malicious and founded in bad faith, is unquestionably advocatory and at the heart of the holding in *Imbler.*' " *Grant v. Hollenbach,* 870 F.2d 1135, 1138 (6th Cir.1989) (internal citations omitted). Nothing in the Supreme Court's decisions subsequent to *Imbler* in any way retreats from this principle. If Plough and Myers were motivated by a desire to drive Lomaz out of business, then they may be held accountable for their actions, (*see, e.g., Imbler,* 424 U.S. at 428–29, 96 S.Ct. 984), but a § 1983 action is not the proper vehicle for achieving such a result. For this reason, Lomaz's extensive claims about the scheme developed by

■ We hold that Plough and Myers were protected by absolute immunity in each of their actions having to do with the search warrant and its execution. There is no question that the prosecutors were acting as advocates for the state when they appeared in front of Judge DiPaulo with the affidavit and search warrant. Prosecutors are entitled to absolute immunity for "initiating a prosecution and ... presenting the state's case." *Imbler*, 424 U.S. at 430, 96 S.Ct. 984. The act of initiating and presenting the state's case includes appearances before a judge to establish probable cause for a search warrant. *See Burns*, 500 U.S. at 496, 111 S.Ct. 1934. It would seem anomalous, therefore, to say that they were not acting as advocates during the preparation of the affidavit and search warrant for presentation in court, particularly where, as here, the undisputed facts demonstrate that when the defendants prepared the affidavit and the warrant, the undercover foray into Lomaz's facility had already revealed the presence of the evidence listed in the warrant, and the marshals had already determined that this evidence, among other things, provided probable cause for prosecuting Lomaz. The purpose for which they sought the warrant, therefore, was not primarily investigative, but was to obtain and preserve the evidence. We think that under these circumstances, the prosecutors were clearly "preparing for the initiation of judicial proceedings." *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606.[8]

Turning to Defendant Plough's role in executing the warrant, we conclude that his action is entitled to absolute immunity as well. The Supreme Court held in *Burns* that "advising the police in the investigative stage of a criminal case is [not] so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity," *Burns*, 500 U.S. at 493, 111 S.Ct. 1934. Plough, however, was not advising the marshals in the investigative stage of this case. Rather, he directed Director of the Department of Commerce to continue the seizure, first, because all of the items listed in the warrant were necessary to the judicial proceedings, and second, because the execution of the warrant could not be begun again if it were discontinued. We conclude that, like the preparation of the affidavit and the warrant, this action was part of the prosecutors' "preparing for the initiation of judicial proceedings." *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606. The district court did not err in concluding that these actions were protected by absolute immunity.

The district court held that the undisputed facts demonstrated that the "unlawfully seized" evidence that Lomaz claims was improperly retained by the defendants, was in fact retained during and in connection with the judicial phase of the criminal process. We agree. The district court did not err in holding that the defendants are entitled to absolute immunity for these actions.

■ All that remains is Lomaz's claim that the district court erred in granting summary judgment on qualified immunity grounds to the defendants for Myers's action in incorporating a business using the name of Buckeye Fireworks and Novelty Company, Inc.

Plough and Myers do not pertain to the inquiry before us.

8. We note in passing that, to the extent that Lomaz complains that the affidavit and warrant were facially invalid, overbroad and not based upon probable cause, such claims would likely be precluded even if the defendants were not entitled to absolute immunity from suit with regard to them. The state trial court denied Lomaz's motion to suppress the evidence obtained pursuant to the warrant, finding that "there was probable cause for the magistrate to issue the [warrant] and that it was properly served and executed." Although the state court eventually dismissed the charges against Lomaz, the Sixth Circuit has held that collateral estoppel can bar the relitigation of the issue of probable cause in

a later § 1983 suit even where the defendant in the prior criminal case was acquitted. *Coogan v. City of Wixom*, 820 F.2d 170, 174 (6th Cir. 1987) (citing *Allen v. McCurry*, 449 U.S. 90, 94–96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). We do note, however, that some courts have held that a "full and fair opportunity to litigate an issue," which is an indispensable prerequisite to the application of collateral estoppel, includes the opportunity to appeal an adverse ruling-an opportunity denied to acquitted defendants. *See, e.g., Dixon v. Richer*, 922 F.2d 1456, 1459 (10th Cir.1991); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir.1995); *Gray v. Lacke*, 885 F.2d 399, 406 (7th Cir.1989), *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990).

■ We agree that this action is not one for which the defendants are entitled to absolute immunity. If it were necessary to reach the issue, we would hold that the district court was correct that they were entitled to qualified immunity for incorporating this business. But it is not necessary to reach the question. Section 1983 is a vehicle available to redress injury suffered by individuals whose constitutional or legal rights have been violated by officials acting under color of law. Without the violation of such a right, there can be no § 1983 claim. As the district court said, "This court knows of no constitutional or federal right to the use of a particular corporate name." We know of none either, and would only add that the fact that it was an assistant county prosecutor who incorporated the allegedly competing business under that particular name does not create such a right.

### III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.