**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0310n.06
Filed: April 22, 2005

**No. 04-1748**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOHN W. WATTS, ANDREW J. MARKS, and KEVIN CRONIN, | ) ) ) | |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| MICHAEL DAY, individually and in his official capacity as Court Administrator of the Allegan County Circuit Court, | ) ) ) ) | |
| Defendant-Appellant. | ) | |

Before: DAUGHTREY and CLAY, Circuit Judges, and SCHWARZER,[*] District Judge.

**PER CURIAM.** Following a dispute over the award of a contract to attorneys to represent litigants in the family division of the Allegan County (Michigan) Circuit Court, the plaintiffs filed a § 1983 action against court administrator Michael Day and other county officials, claiming that the plaintiff attorneys had been cut out of negotiations because of their political speech and participation, in violation of their First Amendment rights. The district court granted Day's motion for summary judgment in part, dismissing claims against him in his official capacity, as the court had also done with regard to the remaining

---

[*]The Hon. William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

defendants. But, after finding that Day had not "demonstrated beyond factual dispute that he is protected by qualified immunity from Plaintiffs' claims against him in his individual capacity," the district court also denied in part the defendant's motion for summary judgment. On appeal, we affirm the order granting partial summary judgment as to the claims against Day in his official capacity. However, because we agree with the district court that material disputes of fact remain concerning the retaliation claim against Day in his individual capacity, we conclude that we lack jurisdiction to review the remainder of the appeal, under the Supreme Court's ruling in *Johnson v. Jones*, 515 U.S. 304, 307 (1995).

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

During calendar year 2000, the Allegan County Circuit Court's Family Division contracted with six attorneys or law firms "to represent indigent respondents and/or parents in delinquency and neglect proceedings." Under the terms of that contract, the court paid the attorneys $175,000 over the course of the year for the representation. As 2000 drew to a close, the parties to the contract began negotiations on its renewal with court administrator Michael Day. Rather than negotiating individually, however, the firms agreed to have Peter Antkoviak serve as their spokesperson and, as they had in the past, divide the court appointments between the "Wolf Group," consisting of the Wolf, Burnett, and Antkoviak firms, and the "Watts Group," consisting of the firms headed by John Watts, Andrew Marks, and Kevin Cronin.

By letter of November 1, 2000, Day proposed to Antkoviak that the parties sign a 2001 contract with the same terms as were included in the 2000 agreement. The attorneys responded on December 15 with a counteroffer that included a cost-of-living increase raising the $175,000 compensation amount to $201,000 for 2001 and $221,000 for 2002. Antkoviak also notified Day by letter dated December 21 that "there is not consensus among the groups that [Day's offer] is an acceptable offer and, therefore, the offer is rejected by the two groups." On December 26, Day sent a hand-delivered letter to Antkoviak, this time indicating that the court's final offer in the matter would allow for only a three percent increase in the applicable compensation, to $180,250, for calendar year 2001. Day further stated that "[a]s your letter indicates that there is a lack of consensus among the groups, I presume that some members are willing to enter into a contract for the above stated figure under the same conditions as the current contract." Day thus agreed "to contract with those members of the group willing to do so, assuming the number of attorneys is sufficient to provide adequate representation while minimizing conflicts." The next day, December 27, Day again wrote to Antkoviak, referring to an intervening conversation in which the two of them had agreed that the Wolf Group would accept all the appointments during 2001 in exchange for $180,250 – in rough numbers, approximately double what they had made the previous year, after splitting the appointments with the Watts Group.

In his letter of December 27, apparently in reference to their intervening conversation, Day also noted: "You informed me that you discussed this matter with the

'Watts Group' and advised them of your intent to enter into this agreement." However, John Watts, speaking for that group, wrote Day on the following day, December 28, expressing surprise that the court administrator was negotiating with a sub-group of the original attorneys' confederation, indicating that they had not been notified of the decision to accept bids from less than the entire group of six attorneys, and submitting a bid for the work in the amount of $170,250, a full $10,000 less than the bid from the Wolf Group. The next correspondence, dated January 10, 2001, was a letter from Day to Watts, informing him that the contract had been awarded to the other group of attorneys. The letter also recited: "While we appreciate your offer, it comes subsequent to said agreement." That statement would be true, of course, only if the agreement had been reached overnight on December 26.

Subsequently, Watts, Marks, and Cronin filed suit against numerous defendants, challenging the award of the contract for legal representation to the Wolf Group. Their principal claim, and the one that is at issue on appeal, alleged that the refusal of Circuit Judges Harry Beach and George Corsiglia, Probate Judge Michael Buck, court administrator Michael Day, and the County of Allegan to consider their bid for the 2001 contract was the result of retaliation for the exercise of First Amendment rights. According to the plaintiffs, the defendants refused to negotiate with Watts, Marks, and Cronin because plaintiff Cronin ran an unsuccessful November 2000 campaign against Buck for the probate court opening, within weeks of the decision to award the contract to the Wolf Group, whose members apparently had supported Buck for election to the seat. Moreover, during the

campaign, candidate Cronin and the other plaintiffs allegedly were associated with unflattering comments about the operation of the courts.

All defendants filed timely motions for summary judgment and the district court undertook an analysis of the positions of all parties to the dispute. In the end, the district judge dismissed both the federal and the state claims filed against defendants Beach, Corsiglia, Buck, and the County of Allegan. He also denied the summary judgment motions of the Antkoviak defendants and defendant Heidi Wolf, finding that the plaintiffs raised at least a genuine issue of material fact in their claims against those defendants on state law claims of malpractice, breach of fiduciary duty, tortious interference, fraud, and unjust enrichment. Finally, although dismissing with prejudice all claims brought against defendant Day in his *official* capacity, the district court denied summary judgment to Day in his *individual* capacity on the plaintiffs' retaliation cause of action. Only defendant Day now appeals any portion of the district court's order.

## II. **DISCUSSION**

Day insists that the district court erred in denying his motion for summary judgment on the claim of retaliation made against him in his individual capacity. According to Day, established principles of absolute judicial immunity or qualified immunity insulate him from liability in this action. Ordinarily, a district court decision denying summary judgment, being an interlocutory order, is not immediately appealable. *See McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004). The decision to deny summary judgment on the basis of

qualified or absolute immunity is, however, immediately appealable as a final judgment under the collateral order doctrine. *See Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010 (6th Cir. 1999) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). We review a decision to deny immunity to a defendant de novo. *See id.*

Summary judgment should be denied to defendants in cases such as this unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact will be found to exist when, viewing the evidence in the light most favorable to the non-moving party, "a reasonable jury could return a verdict for [that] party." *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 801 (6th Cir. 2002).

## A. The Retaliation Claim

Prior to resolving the question of whether Day is entitled to judicial or qualified immunity for his actions in this matter, we "must first examine whether the [plaintiffs] have [even] properly alleged a cause of action [for retaliation]." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). The plaintiffs' retaliation claim is premised upon the provisions of 42 U.S.C. § 1983, which forbids a person acting "under color of any statute, ordinance, regulation, custom, or usage of any State" from denying a United States citizen "any rights, privileges, or immunities secured by the Constitution and laws." Consequently, in order to

establish a § 1983 violation, a plaintiff must demonstrate not only that he or she was deprived of a constitutional or federal statutory right, but also that the deprivation occurred under color of state law.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

In this matter, Day does not dispute that his actions were undertaken under color of state law.  In fact, he argues strenuously that he should be entitled to absolute immunity for those actions because he was, in effect, acting as a state judge when negotiating the service provision contract with the various attorney groups.  Additionally, there can be little dispute that the plaintiffs enjoyed a First Amendment right to run for political office or to support the candidate of their choice without being discriminated against in their jobs as a result.  *See Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is 'the central meaning of the First Amendment.'" (quoting *New York Times v. Sullivan*, 376 U.S. 254, 273 (1964))).

As we explained in *Bloch*:

> In order to prove a claim for retaliation, a plaintiff must establish the following elements:  (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Once a plaintiff can satisfy this burden, a defendant must establish, by a preponderance of the evidence, "that it would have taken the same action even in the absence of the protected conduct." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quotation omitted)).

Here, the plaintiffs have at least alleged facts that could lead to a finding of retaliation. Without question, Cronin was within his First Amendment rights to run for elective office against a candidate supported by sitting judges and, possibly, their staff. Similarly, plaintiffs Watts and Marks were constitutionally entitled to support Cronin, their candidate of choice, and engage in speech indicating the level of that support. *See Glasson*, 518 F.2d at 904. Furthermore, if, as alleged by the plaintiffs, Cronin, Watts, and Marks lost the opportunity to represent indigent clients solely because they challenged the existing power structure within the Family Division of the Allegan County Circuit Court, such retribution would most definitely give pause to "a person of ordinary firmness" before engaging in similar speech. Finally, viewed in the light most favorable to the plaintiffs, the evidence adduced would support a conclusion that Day pursued contract discussions only with those attorneys who endorsed candidates favorable to the sitting members of the court.

Although the facts presented could justify a conclusion that Day's decision to contract with only the Wolf Group was *not* politically motivated, those facts would also

support a determination that defendant Day retaliated against the plaintiffs for running against, or supporting a candidate running against, Day's superiors. Certainly, the fact that Day was aware that the once-unified group of attorneys that had previously contracted with the county was now splintered into two competing factions and that Day turned down the plaintiffs' offer of a compensation package that would have saved the county $10,000 only one day after negotiating with the Wolf Group, does provide some evidence that the defendant considered factors other than the best interests of the court and the county in reaching his decision in this matter. Thus, the plaintiffs have properly *alleged* a cause of action for retaliation under § 1983.

### B. The Absolute Immunity Claim

Recognizing that at least a genuine issue of material fact exists in this case regarding the motivation of Day in excluding the plaintiffs from the county contract for the provision of legal services to litigants before the Family Division of the Allegan County Circuit Court, the defendant next asserts he was absolutely immune from the claims made in this suit. Specifically, Day contends that he was, in contracting for those services, acting as a judge who cannot be held financially liable in federal court for the exercise of his judicial duties.

Generally, judicial officers are absolutely immune from suit for money damages under § 1983 for their judicial decisions so as to allow them "to make controversial decisions and act upon their convictions without fear of personal liability." *Cooper v.*

*Parrish*, 203 F.3d 937, 944 (6th Cir. 2000) (citing *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978)). Such individuals will not, however, be considered immune from suit "for non-judicial actions, i.e., actions not taken in the judge's judicial capacity," and "for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 945 (citations omitted). When determining whether a grant of immunity is proper, we look to the nature of the function at issue and not merely to the identity of the actor or the harm caused. *See Lomaz v. Hennosy*, 151 F.3d 493, 497 (6th Cir. 1998). As we noted in *Cooper*:

> This functional approach typically turns on two factors. First, a court must determine whether an act is related to those general functions that are normally performed by a judicial officer. Second, a court must assess whether the parties expected to deal with the judicial officer in the officer's judicial capacity.

*Cooper*, 203 F.3d at 945 (citations omitted).

Furthermore, absolute judicial immunity should be recognized only sparingly. *See Lomaz*, 151 F.3d at 497. "[T]he official seeking the immunity bears the burden of showing that his actions are entitled to such absolute protection." *Id.* (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

An examination of Day's actions in this situation makes clear that the defendant was not entitled to the protections afforded by the cloak of absolute judicial immunity. It is conceivable that the negotiation of contracts with attorneys for the provision of legal

services to the indigent could be considered "related" to the duty of a judge to appoint counsel as needed in family court matters. Nevertheless, there is absolutely no indication in this record that any of the affected attorneys did or could consider their dealings with Day during the contractual negotiations to constitute an exercise by the defendant of adjudicatory authority. At no time during those negotiations did Day pretend to be anything other than what he was – a court administrator performing the administrative function of selecting a list of attorneys that the *judges themselves* could use to appoint counsel for those persons before the court requiring legal representation.

In *Lomaz*, this court, citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993), stated that "[w]here the [defendant] acts more as an administrator or investigator . . . he may claim only qualified immunity. . . ." Because Day merely performed the administrative act of negotiating a contract with area attorneys, and did not engage in the judicial function of actually appointing counsel to represent persons before the court, the defendant was not entitled to absolute judicial immunity from suit in this matter. The district court thus did not err in denying Day that protection.

### C. **The Qualified Immunity Claim**

Defendant Day asserts that, even if he cannot claim the protections from suit afforded by the principles of *absolute* immunity, he is entitled to *qualified* immunity from the allegations made by the plaintiffs. It is now well-established that "government officials performing discretionary functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> In evaluating a claim of qualified immunity, we undertake a three-step analysis:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Shamaeizadeh v. Cunigan*, 338 F.3d 535, 545-46 (6th Cir. 2003) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003), and *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)), *cert. denied*, 124 S.Ct. 2159 (2004):

In determining whether a constitutional violation has occurred in this case, we first examine whether the plaintiffs' speech is protected by First and Fourteenth Amendment guarantees. *See Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003). Speech, like the plaintiffs' campaign for public office and outward manifestations of political support, will be considered "protected" if it involves a matter of public concern, *see Connick v. Myers*, 461 U.S. 138, 147 (1983), and the plaintiffs' interest in the speech outweighs any governmental interest in suppressing or regulating the communication of ideas. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968).

The mere articulation of this standard is sufficient to establish the protected nature of the plaintiffs' speech. Clearly, a decision to make oneself a candidate for an elective judicial office is a matter of public concern. So, too, is the decision of private attorneys serving in those courts to endorse candidates who they feel will improve the machinery for the delivery and administration of justice. Additionally, given the complete and utter lack of any governmental interest in suppressing such speech, a balancing of competing interests decisively tips the scales in favor of recognition of the protected nature of the plaintiffs' expressions.

The plaintiffs in this case have also offered evidence to show that defendant Day violated their constitutional rights by making decisions calculated to retaliate against them for their political speech. Day, however, insists that there is no evidence that protected speech played any role in the decision as to which attorneys would be allowed to contract to represent clients in the Family Division of the Allegan County Circuit Court, or that the defendant himself was in any way responsible for that decision. Although it is true that Day himself was not a party to the actual contract between the court and the attorneys comprising the Wolf Group, he was responsible for the contract negotiations and he rejected the lower contract bid of the Watts Group on what appears to be a manufactured ground, i.e., that the offer came after an agreement with the Wolf Group had already been reached. Day, therefore, played a significant role in the decision that favored one group of attorneys that supported the candidate of Day's superiors over another group of attorneys who challenged the candidate supported by the sitting circuit court judges.

Day also argues that no constitutional violation occurred here because he offered the same contractual terms to the attorneys in the Wolf Group as to the attorneys in the Watts Group, all of whom rejected the initial offer. It is also true, however, that Day was aware that two separate groups of attorneys were included in the original bargaining group and that he then availed himself of the opportunity to exclude one such group from further negotiations. Given the need to consummate an agreement, one might conclude that Day harbored no malicious animus toward the Watts Group, were it not for the fact that the attorneys who challenged Day's superiors by running for public office had submitted their own bid on contract services the day following talks with the Wolf Group. Furthermore, not only did the defendant fail to take the obvious precautionary step of checking with both groups before agreeing with either one's offer, but he rejected out-of-hand the proposal of the Watts Group that those attorneys would provide the requested services for a price that was 5.5% lower than that agreed to by the sitting judges' supporters. These facts establish a genuine dispute as to Day's knowledge and motivation in the contract negotiations. Because the qualified immunity determination thus turns, not upon a question of law, but upon the question of what facts the parties can prove, the principles of *Johnson v. Jones* require us to dismiss this portion of Day's appeal for lack of subject matter jurisdiction.

## CONCLUSION

For the reasons set out above, we conclude that the district judge correctly resolved the issues presented on motion for summary judgment. We therefore AFFIRM the district

court's order granting Day summary judgment on the plaintiffs' claims against him in his official capacity. Because the district court correctly held that there are material issues of disputed fact regarding the claims against Day in his individual capacity, we have no subject-matter jurisdiction to review that portion of the appeal, and it must therefore be DISMISSED.